**R.B. MATTHEWS, INC.,**
**Plaintiff–Appellee,**

**v.**

**TRANSAMERICA TRANSPORTATION SERVICES, INC., a corporation,**
**Defendant–Appellant.**

**No. 90–15509.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 19, 1991.

Decided Sept. 19, 1991.

Bruce W. Belding, Graham & James, San Francisco, Cal., for defendant-appellant.

Fred R. Brinkop, Branson, Fitzgerald & Howard, Redwood City, Cal., for plaintiff-appellee.

* Honorable Gary L. Taylor, United States District Judge for the Central District of California, sitting by designation.

Before GOODWIN and SNEED, Circuit Judges, and TAYLOR,* District Judge.

SNEED, Circuit Judge:

Transamerica Transportation Services, Inc. (TTS) appeals from the judgment entered below in favor of the plaintiff, R.B. Matthews, Inc. (RBM). The lower court, in a bench trial, found that TTS did not use its "best efforts" to provide 600 trailers to RBM pursuant to their agreement. The court awarded $551,300 to RBM. We affirm the judgment as to liability, but reverse the award of damages and remand the case for further determinations on the damages issue.

## I.

## FACTS

RBM is a California corporation engaged in the business of used trailer sales and repairs. TTS leases trailers to railroads for nationwide use. In late 1983, RBM agreed to purchase 90 "drop frame" trailers from TTS. The agreement was in the form of a Standard Trailer Sales Contract common to transactions in the trailer industry. In April, 1984, the two companies entered into a second agreement whereby TTS was to use its "best efforts" to make 300 used trailers available for purchase by RBM in each of the years 1984 and 1985. By the end of 1985, however, RBM had received only 242 of the 600 trailers specified in the contract.[1] After receiving complaints from RBM, TTS continued to state that it would comply with the agreement. The remainder of the trailers were not, however, forthcoming.

On December 11, 1986, RBM brought suit against TTS in California state court alleging breach of contract, fraud, misrepresentation, and bad faith on the part of TTS in its carrying out of the contract. RBM also specifically alleged that TTS had failed to use its "best efforts" in making the contracted-for trailers available. TTS timely removed the action to federal dis-

1. TTS provided 158 trailers in 1984 and 84 trailers in 1985.

trict court. The bench trial was held in February, 1990. The district court dismissed RBM's tort, fraud, and punitive damages claims at the conclusion of RBM's case. Thereafter, the court, at the conclusion of trial, held that TTS had not used its "best efforts" to provide the trailers and awarded RBM damages in the amount of $551,300.

On appeal, TTS argues that the district court erred in its decision to preclude the live testimony of witnesses for the defense, in its interpretation of the contract, and in its computation of damages. It seeks reversal and remand for a new trial.

## II.

### JURISDICTION AND STANDARD OF REVIEW

 This court has jurisdiction pursuant to 28 U.S.C. § 1291. We review for abuse of discretion a trial judge's decision to exclude live witness testimony. *United States v. Layton*, 767 F.2d 549, 553 (9th Cir.1985). A district court's decision based on the language of a contract is a question of law that we review de novo. *See Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir.1985). When the district court's decision is based on findings of fact, reversal will only occur when the decision is clearly erroneous. *Id.* Finally, we review the legal standards used in the calculation of damages de novo. *Galindo v. Stoody Co.*, 793 F.2d 1502, 1516 (9th Cir.1986).

## III.

### DISCUSSION

A. *Preclusion of Witnesses' Live Testimony*

 TTS first contends that the district court abused its discretion when it precluded the live witness testimony of two TTS

employees whose depositions had previously been read into the record by RBM. TTS had scheduled Seaton Reed, its vice president of operations, and Charles White, its sales representative, to testify in person during TTS's defense case. These two witnesses were expected to testify about TTS's understanding of and performance under the contract. RBM noticed and took the deposition of Reed and White before trial. At trial, RBM attempted to call them as witnesses, but TTS refused to produce them or bring them within the subpoena range of the court. RBM decided to read excerpts from the Reed and White depositions into the record during the presentation of its case. After certain excerpts from White's deposition had been read, the trial judge announced that he could not be called to testify in person. He also ruled that no other witnesses could testify in person if portions of their deposition testimony were read into the record prior to an offer of their live testimony. TTS complains on appeal that this exclusion was improper, that its attempts to make an offer of proof were denied, and that prejudice resulted from the trial court's decision.

Although TTS properly preserved this issue for appeal,[2] its claims as to error and prejudice are meritless. Trial judges have wide discretion to exclude evidence given their presence at the trial and because the considerations arising under Rule 403 are "susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues." *Layton*, 767 F.2d at 554.

As a general matter, the actions of the trial court are troubling because, if made a practice, they could skew discovery. Were depositions, for example, to be used to replace live testimony, both plaintiffs and defendants would be forced to elicit the planned testimony of their witnesses dur-

---

**2.** TTS failed to make a formal offer of proof to the district court as required by rule 103(a)(2) of the Federal Rules of Evidence. Failure to make an offer of proof, however, is excused if an offer of proof would have been redundant, unnecessary, or futile. *See, e.g., Waltzer v. Transidyne Gen. Corp.*, 697 F.2d 130, 134 (6th Cir.1983); *Collins v. Wayne Corp.*, 621 F.2d 777, 781 (5th Cir.1980); *United States v. Alden*, 476 F.2d 378, 381 (7th Cir.1973). The record indicates that defendant's failure to make a formal offer of proof falls within both the "obviousness" standard and the "futility" standard and should, therefore, be excused for purposes of this appeal.

ing depositions, thus disclosing at that time their entire trial strategy. However, on the facts of this case, no such problem exists. Moreover, equity does not favor the defendants. By denying RBM's requests to produce Reed and White as live witnesses, TTS engaged in gamesmanship, forcing RBM to rely on depositions. The district court did not abuse its discretion when it forced TTS to rely on deposition testimony as well. If TTS had truly wished to present the live testimony of White and Reed, it could have done so by making those witnesses available when RBM requested that they be produced.

■ Even if the exclusion of the live testimony of White and Reed were erroneous, TTS has failed to indicate any prejudice it suffered as a result. A trial court abuses its discretion only if the exclusion "prejudicially deprived [the defendant] of material evidence critical" to its defense. *United States v. Ives*, 609 F.2d 930, 933 (9th Cir.1979) (quoting *United States v. Hartfield*, 513 F.2d 254, 260 (9th Cir.1975)), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980). The burden of showing prejudice is particularly heavy in a bench trial. *See Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338, 355 (6th Cir.1984). TTS has not shown how the precluded testimony would have contributed to its case, or how the trial court would have modified its verdict had it heard the testimony. At most, TTS asserts that Reed and White were two key participants in the contract negotiations and that their live testimony would have elaborated upon their deposition testimony and given the court a chance to assess their demeanor and credibility. However, in light of the testimony of other "key" TTS employees (whose testimony covered the areas to be addressed in White's and Reed's live testimony), as well as the deposition testimony of the two excluded witnesses themselves, TTS has not detailed any prejudice it might have suffered from the exclusion. At a minimum, TTS must prove the unique substantive contributions that the live testimony of White and Reed would have made, since, in the absence of such contributions,

the issue of witness credibility is rendered insignificant and harmless. TTS has failed to make such proof.

B. *The District Court's Interpretation of the Contract*

TTS alleges several errors in the district court's interpretation of the contract. Each of those claims is without merit.

1. *The Obligation of TTS*

The first alleged error concerns the scope of TTS's supply obligations under the contract. TTS contends that the district court falsely read the contract to impose on TTS a *duty* to provide 600 trailers to RBM rather than the lesser obligation to exert its "best efforts" to make 600 trailers available.

The record does not support this contention. In its first finding of fact, the court wrote: "[T]he agreement provided that defendant use its 'best efforts' in complying with the contract, but plaintiff was required to purchase up to 300 trailers per year for two years at pre-set prices." Findings of Fact and Conclusions of Law of March 8, 1990, at 5. The court's fifth finding of fact reemphasized this conclusion: "The written agreement obligated Matthews to purchase up to 300 drop frame trailers from TTS during each of the years 1984 and 1985, but required TTS to use its 'best efforts.' " *Id.* at 6. The court properly determined that defendant was obliged to use its "best efforts" to provide 600 trailers for sale to RBM. The court did not impose an absolute duty on TTS to tender 600 trailers for RBM's acceptance during 1984 and 1985.

2. *Defective Performance by TTS*

■ Even if the district court did not misinterpret TTS's obligations under the contract, TTS contends that it erred when it concluded that TTS had not exerted its "best efforts" to provide the 600 trailers. Our review of the record indicates that the district court's fact-based conclusions were not clearly erroneous. Evidence at trial demonstrated that TTS sold over 600 trailers to other companies during the two-year

period; that it failed to place anyone in charge of overseeing the agreement with RBM after the previous supervisor left the company in early 1984; and that it rejected the use of incentive programs and brokers that could have facilitated transportation of additional trailers to the place of delivery, Oakland, at minimal cost.

### 3. Applicability of the Standard Sales Contract

■ TTS next alleges that the district court erred when it held that TTS's standard trailer sales contract was not part of the agreement, and that, in the alternative, the terms of that standard sales contract had no relevance to the dispute at issue. The overall agreement provided that all the trailers would be delivered, as previously indicated, to Oakland, California. The agreement then said: "RBM will accept each trailer 'as is' and subject to the terms of TTS's standard trailer sales contract as attached hereto as Exhibit A." The third paragraph of the standard sales contract also covers delivery details.

> Seller will use all reasonable means to make delivery on the date wanted as indicated on the face of this order but it is understood and Purchaser agrees that Seller shall have no liability whatsoever for loss or damage arising out of delivery later than the date wanted....

The final paragraph of the standard sales contract states: "Seller and Purchaser further agree that Seller shall have no liability for any cargo loss, loss of use or any other incidental or consequential damages arising out of this sale."

We need not determine whether the district court's holding that the standard sales contract was not part of the agreement was correct. Any error, if committed, is harmless because the terms of the standard sales contract are inapplicable to the dispute in this case which centers upon allegations of non-delivery. The terms of the agreement, set out above, only pertain to the details of actual delivery and accept-

ance. The issue here is whether the defendant performed its basic duty to use its "best efforts" to obtain trailers to deliver. Thus, the district court correctly held that the standard sales contract had no bearing on other issues arising out of the general agreement.

### C. Computation of Damages

Although we agree that the district court properly concluded that TTS violated the contract, we remain uncertain as to the time of breach and disagree with the court's computation of damages.

■ The rules for measuring damages are very simple. When a seller breaches the contract, the buyer has two possible remedies. First, he may attempt to cover and obtain goods in substitution for those due from the seller. See Cal. Com.Code Ann. § 2711(1)(a) (West 1964).[3] If he covers, he can recover the difference between the cost of cover and the contract price together with any incidental or consequential damages. Id. § 2712(2). Consequential damages are those damages which did not arise within the scope of RBM's transactions with TTS, but which stemmed in a foreseeable way from losses incurred by RBM as a result of TTS's breach. Id. § 2715(2)(a). The profits that RBM lost from its resale of the refurbished trailers are one form of consequential damages. See Milgard Tempering, Inc. v. Selas Corp. of America, 902 F.2d 703, 710–11 (9th Cir.1990) (awarding consequential damages in the form of lost profits where the buyer was unable to produce up to capacity as a result of the faulty performance of the purchased equipment); Dura–Wood Treating Co. v. Century Forest Indus., Inc., 675 F.2d 745, 755 (5th Cir.1982) (recognizing as a general proposition that consequential damages include the lost profits from a buyer's dealings with a third party), cert. denied, 459 U.S. 865, 103 S.Ct. 144, 74 L.Ed.2d 122 (1982).

---

**3.** We apply California law out of convenience. We note that the district court refrained from deciding the choice-of-law issue because California and Illinois have adopted roughly similar versions of the Uniform Commercial Code. Moreover, neither party has raised an objection to the application of California law.

■ The buyer's second remedy is to recover the difference between the market price and the contract price. *Id.* § 2711(1)(b), 2713(1). In this case the contract-market price differential is the difference between the market price of the unmodified trailers TTS agreed to provide RBM and the contract price of those trailers. The buyer can also recover consequential damages under this second remedy but only if they could not have been reasonably prevented by cover or otherwise. *Id.* § 2715(2)(a). If a buyer could have covered, but chose not to do so, then he cannot recover consequential damages. The buyer would only be allowed to recover the contract-market price differential.

In this case, in order to recover consequential damages, RBM must be able to demonstrate that it actually covered, or reasonably tried to cover and failed, if it wants to recover its consequential damages. If the breach occurred so late in the contract term that RBM was unable to cover, then it can recover its consequential damages. If, however, the breach occurred at an earlier time, and RBM chose not to cover when it could have reasonably done so, then it will not be able to recover any of its consequential damages that accrued after the breach.

This brings into sharp focus the questions before us. Did TTS breach its contract? When did the breach occur? Did RBM have an opportunity to cover?

### 1. *Was There a Breach?*

As already indicated, we agree with the district court that TTS did not employ its "best efforts" to perform this contract. Therefore, there was a breach.

### 2. *When Did the Breach Occur?*

Here we differ with the district court. Its computation of damages (average lost net profits per trailer multiplied by the number of trailers that were not delivered) demonstrates that it considered the breach to have occurred on the last day of the contract period. Otherwise the district court would have been forced to inquire whether there had been an opportunity to cover because, had there been such an opportunity, damages would have been the difference between the contract price and the cover price.

■ We cannot on the basis of the record before us accept the view that no breach accrued until the last day of the contract period. While we accept the district court's finding that TTS did not repudiate the contract during its term, we are not convinced that its deliveries of trailers during that term represented the results of its "best efforts" to perform. If it did not, the contract was breached prior to the last day of the contract period. Moreover, the magnitude of the difference between the number of trailers that RBM was obligated to accept and those actually delivered over the term of the contract suggests that the breach may have been material. Were this the case, RBM should have been relieved of its obligation to purchase trailers by treating the contract as totally breached and obtaining cover to the extent possible. In that event, the recovery of consequential damages would be reduced, if not eliminated, and damages would be measured by the differences between the contract price and the cover cost.

■ Even though the breach was material, RBM could have elected to treat it as immaterial and continue to stand ready to accept performance by TTS. Such an election by RBM could not enhance the damages recoverable from TTS, however. The duty to mitigate damages dictates this result. *Carnation Co. v. Olivet Egg Ranch*, 189 Cal.App.3d 809, 816, 229 Cal.Rptr. 261, 265 (1986) (stating the general rule that a buyer of goods must attempt to minimize damages). Acceptance by RBM of late and insufficient performance by TTS can only serve to reduce the damages that otherwise would be recoverable had RBM treated the contract as totally breached.

### 3. *Did RBM Have an Opportunity to Cover?*

■ The foregoing analysis rests on the assumption that RBM could have purchased the trailers, which TTS failed to

deliver, from others reasonably quickly after the material breach by TTS. That is, it rests on the assumption that RBM had an opportunity to cover. The record does not adequately reveal whether such an opportunity existed. If it did not, consequential damages are recoverable; that is, the profits RBM could have made had there been a delivery of 600 trailers become the proper measure of damages. Only under these conditions can it be said that the measure of damages employed by the district court was proper.

IV.

CONCLUSION

Because of the indicated deficiencies in the record we must reverse the judgment of the district court and remand for further proceedings consistent with this opinion. Because the district court properly concluded that TTS breached the contract, these proceedings must address particularly two of the three questions discussed above, *viz.:* (1) When did the breach occur, and (2) was there an opportunity for RBM to cover?

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.